UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------x
CHRISTIAN KILLORAN,
on behalf of his son, A.K.,
CHRISTIAN KILLORAN, and
TERRIE KILLORAN,

                Plaintiffs,            MEMORANDUM & ORDER
                                           19-CV-3298(JS)(SIL)

    -against-

WESTHAMPTON BEACH SCHOOL DISTRICT,
MICHAEL RADDAY as Superintendent,
SUZANNE M. MENSCH, JAMES HULME,
JOYCE L. DONNESON, GEORGE R. KAST, JR.,
and HALSEY C. STEVENS,
as Board of Education Members,

                Defendants.
----------------------------------x

For Plaintiffs:     Christian Killoran, Esq., pro se
                     Terrie Killoran, pro se
                     132-13 Main Street
                     Westhampton, New York  11978


For Defendants:     Anne C. Leahey, Esq.
                     Anne Leahey Law, LLC
                     17 Dumplin Hill Lane
                     Huntington, New York  11743

                     Scott J. Kreppein, Esq.
                     Jaclyn L. DarConte, Esq.
                     DEVITT SPELLMAN BARRETT, LLP
                     50 Route 111
                     Smithtown, New York  11787

SEYBERT, District Judge:

        Pro se plaintiffs Christian Killoran ("Mr. K") and

Terrie Killoran ("Mrs. K") (together, the "Plaintiffs") commenced

this action on behalf of their son, A.K., against defendants

Westhampton Beach School District, ("Westhampton" or the

"District"), Michael Radday, ("the Superintendent"), Suzanne M. Mensch, James Hulme, Halsey C. Stevens, Joyce L. Donneson and George R. Kast, Jr., (together, the "School Board," and collectively with Westhampton and the Superintendent, "Defendants").  Currently pending before the Court is Plaintiffs' motion for summary judgment (hereafter, the "Motion") (see ECF No. 39 (including Plaintiffs' Support Memo; see also Reply, ECF No. 42) seeking review of the April 17, 2019 administrative decision of state review officer ("SRO") Sarah L. Harrington ("SRO Harrington") upholding the February 20, 2019 determination of independent hearing officer ("IHO") Leah L. Murphy ("IHO Murphy") that the May 2018 individualized education program ("IEP") the District developed for A.K. was sufficient to provide A.K. with a free and appropriate education ("FAPE") in the least restrictive environment ("LRE") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.  For the following reasons, Plaintiffs' Motion is DENIED.

BACKGROUND

I.   Statutory Framework for IDEA Cases

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living."  20 U.S.C. § 1400(d)(1)(A).  Under the

2

IDEA, states receiving federal funds are required to comply with extensive procedural requirements to ensure that all children with disabilities receive a FAPE. See Bd. of Educ. v. Rowley, 458 U.S. 176, 180-81, (1982). "The particular educational needs of a disabled child and the services required to meet those needs must be set forth at least annually in a written IEP." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (citation omitted).

In New York, the state has assigned responsibility for developing IEPs to local Committees on Special Education ("CSEs"). See R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012) (citing N.Y. Educ. Law § 4402(1)(b)(1)). "CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." Id. (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)). "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." Id. (citing Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107-08 (2d Cir. 2007)). The IDEA sets forth procedural and substantive requirements for IEPs, see 20 U.S.C. § 1414, but "does not itself articulate any specific level of educational benefits that must be provided through an IEP." Walczak, 142 F.3d at 130.

3

If a parent believes that his school district has failed to provide his child with a FAPE due to an inadequate IEP, the parent may file a complaint with the state educational agency and request an impartial due process hearing before an IHO.  See id. at 123; see also N.Y. Educ. Law § 4404(1).  Either party may appeal an adverse administrative decision to the appropriate state agency. See id.; see N.Y. Educ. Law § 4404(2).  "Only after these administrative remedies have been exhausted may an aggrieved party appeal to a federal or state court, which may then grant appropriate relief."  M.R. v. S. Orangetown Cent. Sch. Dist., No. 10-CV-1800, 2011 WL 6307563, at *12 (S.D.N.Y. Dec. 16, 2011) (citing 20 U.S.C. § 1415(i)(2)(A)).  "When such an action is brought in federal district court, the court reviews the records of all of the prior administrative hearings and must hear additional evidence if so requested by either of the parties." M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 225 (2d Cir. 2012) (citing 20 U.S.C. § 1415(i)(2)(c)).

The Second Circuit has held that where, as here, plaintiffs seek judicial review of an SRO's determination that an IEP was proper, the plaintiffs bear the burden of proof.  See id. at 225 n.3 ("Because the State Review Officers in the cases at bar concluded that the IEPs were proper, and the courts are bound to exhibit deference to that decision, the burden of demonstrating

that the respective Review Officers erred is properly understood to fall on the plaintiffs.").

II.   Factual Background[1]

This action is one in a series of civil rights litigation brought by Plaintiffs against Westhampton concerning the education of Plaintiffs' son, A.K., who has Down Syndrome and a full-scale IQ of 47, classifies as a student with an intellectual disability, and was sixteen years old at the time of the subject administrative hearing.  (See Compl., ECF No. 1; Nov. 7, 2018 Hr'g Tr. ("Nov. 7 Tr."), ECF No. 32-6, at 170; May 2018 IEP, ECF No. 32-19, at 1.) The Court assumes familiarity with the background of this case, which is chronicled in its various prior Orders.[2]  See, e.g., Killoran v. Westhampton Beach UFSD, No. 19-CV-6663, 2020 WL

---

[1]  The following facts are taken from the Complaint, the parties' submissions and the underlying administrative record (see ECF Nos. 32-1 through 32-24), and are undisputed unless otherwise noted. Unless otherwise noted, for ease of reference, the Court cites to the Electronic Case Filing System ("ECF") pagination.

[2]  Plaintiffs have filed numerous administrative proceedings and multiple federal actions against the District regarding A.K.'s education. (See, e.g.: Case Nos. 15-CV-4743, 17-CV-0866, 17-CV-3553, 18-CV-3389, 19-CV-5078, 19-CV-6663, 20-CV-0269, 20-CV-4121, 20-CV-4763, 21-CV-1281, and 21-CV-3264.)  Here, the Court confines its analysis solely to the proceedings relevant to the issues presented in Plaintiffs' Motion.

Additionally, as the Court's prior orders have noted, since Mr. K is an attorney, his pleadings are not entitled to the "special consideration which the courts customarily grant to pro se parties."  Bazadier v. McAlary, 464 F. App'x 11, 12 (2d Cir. 2012) (internal quotation marks and citation omitted).

4740498, at *1-3 (E.D.N.Y. June 24, 2020), report and recommendation adopted by 2020 WL 4743189 (E.D. N.Y. July 27, 2020).  The instant action arises out of Defendants' development of A.K.'s IEP and placement for the 2018-2019 school year.  (See Compl.)

A. The May 2018 IEP

On March 5, April 9, and May 22, 2018, the District's CSE convened to review A.K.'s progress and to develop an IEP for the 2018-2019 academic year.  (See IHO 2019 Decision, ECF No. 32-2, at 24.[3])  CSE members included: Dr. Angela Austin ("Dr. Austin"), CSE Chairperson and Director of Pupil Personnel Services; Theresa Gannon (hereafter, the "special education teacher"); Joanne Williams (hereafter, the "District special education teacher"); Margaret Brogan (hereafter, the "occupational therapist"); Eileen Catala (hereafter, the "physical therapist"); Connor Davis (hereafter, the "adaptive physical education teacher"); Elizabeth Martrano (hereafter, the "high school psychologist"); Eileen Tyznar (hereafter, the "education consultant"); Mrs. K., A.K.'s mother; and, Mr. K., A.K.'s father.  (See Mar. 5, 2018 CSE Minutes ("March 2018 CSE"), ECF No. 32-15, at 2.)  In developing A.K.'s IEP, the CSE reviewed documents, including: A.K.'s prior IEP;

---

[3]   In his February 20, 2019 decision, IHO Murphy included a comprehensive review of the Parents' multiple prior challenges to A.K.'s IEPs.  (See IHO 2019 Decision, Procedural Background, at 7-20.)

progress reports and annual reviews from A.K.'s occupational therapist ("OT") and physical therapist ("PT"); a 2016 psychological evaluation; a 2016 speech and language evaluation report; a 2016 psychoeducational evaluation; and a 2014 assistive technology evaluation. (See id. at 1.) Additionally, A.K.'s service providers, including his OT, PT, special education teacher, and adaptive physical education teacher reported on A.K.'s functioning. (See id.) A.K.'s present levels of performance and goals were discussed at the CSE meetings with significant input from his Parents and special education teacher. (Id.)

The March 2018 CSE[4] discussed placement options, including pushing A.K. into general education classes and the extent to which the curriculum would need to be modified to meet his needs, and the Parents' preferred placement, i.e., creating a "hybrid program." (See March 2018 CSE at 55-69.) Dr. Austin opined that the Parents' proposed "hybrid program" would be socially and emotionally isolating, while A.K.'s special education

---

[4] The March 2018 CSE meeting was held upon SRO Krolak's directive, instructing the District to complete the placement process for A.K. for the 2017-2018 school year. (See June 28, 2018 IHO Murphy Order, ECF No. 32-14, at 12.) Because the District did not have a high school level "alternatively assessed program" that would address A.K.'s functional needs, the CSE recommended A.K.'s placement for the 2017-2018 school year be in a 12:1+1 class located in the Middle Country School District. (See id. at 16.) A 12:1+1 classroom is a classroom with twelve students, one special education teacher, and one teacher's aide.

teacher disagreed, stating her belief that A.K. would thrive from seeing his brother in the hallway or seeing some of the children with whom had had grown up.  (Id. at 27-30, 188.)  As to placing A.K. in a general education class, the District's special education teacher pointed out that A.K. was reading at a first-grade level and that "[t]here is no way to really adapt a high school Common Core curriculum that is Regents track to the first-grade level." (Id. at 190.)  She stated that it would be "educationally unsound" to modify the regular education curriculum to A.K.'s level.  (Id.) The high school psychologist agreed with the District's concerns of placing A.K. into a Regents track class at the high school. (See id. at 199.)

Jennifer Harrison ("Ms. Harrison"), Director of Pupil Personnel Services at the Middle Country School District, discussed the alternate assessment program at the Middle Country School District, which the Parents had visited.  (See id. at 85.) She described the program at one of that district's high schools as a secondary "life skills" program with a current enrollment of approximately 45 students.  (Id.)  The program consisted of a nine-period day, in a high school building with approximately 1,600 students.  (Id. at 86.)  Ms. Harrison explained that the students in the "life skills" program see multiple teachers during the day and have access to mainstream electives where appropriate.  (Id.) Program students participate in a work-study program for three

8

periods a day within the community, and eat in the cafeteria with their typical peers.  (See id.)  She explained that the program instruction is not based on the New York State Common Core curriculum but, rather, is IEP-based and includes functional academics, reading, writing, mathematics, and mainstream electives.  (See id. at 93.)  She stated that, having observed A.K., A.K. appeared to be very similar to some of the students currently in the program.  (See id. at 94.)

The CSE reconvened on April 9, 2018 to review A.K.'s 2017-18 draft IEP for the present levels of performance and goals.  (April 9, 2018 CSE Minutes ("April 2018 CSE"), ECF No. 32-18, at 9.)  Mr. K stated that Plaintiffs had never agreed to the IEP, and that he believed that the goals were not aligned with the general education curriculum.  (See id. at 11-13.)  To that end, Mr. K handed out guidance documents from the U.S. Department of Education and the N.Y.S. Department of Education, which Dr. Austin agreed to review.  (See id. at 14-20.)  Mr. K also wanted to discuss whether the general education curriculum could be modified to meet A.K.'s academic goals.  (See id.)  In response, Dr. Austin pointed out that A.K. was an ungraded student whose expectations follow the alternate assessment, not the Regents level curriculum.  (See id. at 17-18.)  Dr. Austin noted that this was the first time the Parents, who had worked specifically on the language of the goals at the prior CSE meeting, raised concern that the goals should be,

not just "functional" but, aligned with the "grade-level general education content standards." (See id. at 34-36.) Mr. K did not disagree that A.K. needed functional goals, but believed it was "imperative" that A.K. be "afforded access to the general education curriculum," and "that the general education curriculum [be modified] to meet [his] unique and individualized education goals." (Id. at 81-93.)

On May 22, 2018, the CSE reconvened for A.K.'s annual review and to decide upon a placement for A.K. for the 2018-2019 school year. (See May 22, 2018 CSE Minutes ("May 2018 CSE"), ECF No. 32-17.) At that time, A.K.'s services were being delivered individually both at Westhampton Beach High School and in his home for two hours with a special education teacher. (See id. at 4.) The Parents' preferred "hybrid program" was the central topic of the meeting. (See May 2018 CSE.) Dr. Austin maintained that the ninth-grade general education curriculum was an inappropriate reference to meet A.K.'s needs. (See id. at 174-76.) While she agreed that mainstreaming A.K. for lunch and electives was appropriate, Dr. Austin maintained that A.K.'s academics should be delivered in a small special class to which A.K.'s Parents had previously agreed. (See id.).

Ultimately, the CSE found that A.K. remained eligible for special education and related services as a student with an intellectual disability and recommended a 12:1+1 special class

placement for the 2018-2019 school year, "to focus on functional academics and vocational skills," adapted physical education, related services, including speech-language therapy, OT, PT, and parent counseling and training, and special instruction (delivered in the home).  (May 2018 IEP at 16-18).  The May 2018 IEP also included: strategies to address A.K.'s "management needs; annual goals; supplementary aids and services, program modifications, and accommodations; assistive technology devices or services; and supports for school personnel on behalf of [A.K.]".  (Apr. 17, 2019 SRO Harrington Decision ("SRO 2019 Decision"), ECF No. 32-1 at 3 (citing May 2018 IEP).)  A.K.'s May 2018 IEP provides that A.K. will not participate in regular education in all academic areas, speech, OT, PT, and adaptive PE; however, A.K. will participate in regular education in all special areas and lunch. (See May 2018 IEP at 19.)  As to placement, the May 2018 CSE recommended that A.K. attend an out-of-district public school, which was the same out-of-district public school location recommended at the March 2018 CSE meeting for A.K.'s 2017-2018 IEP. (See SRO 2019 Decision at 4; May 2018 IEP at 20.)

B.  Administrative Proceedings

Unsatisfied with the CSE's developed IEP for the 2018-2019 academic year, on September 14, 2018, Plaintiffs filed a due process complaint alleging that Westhampton had failed to provide A.K. with a FAPE as required by the IDEA.  (See Compl. ¶¶ 20-22;

11

SRO 2019 Decision at 6).  They alleged that Westhampton had failed to: (1) "conduct a meaningful analysis regarding whether it could employ its special education resources toward addressing the unique and individualized needs of A.K."; and (2) develop an IEP that was "appropriately ambitious[.]"  (Compl. ¶¶ 21-22.)

### 1. IHO Decision

Thereafter, an impartial hearing was convened, taking place over seven non-consecutive days between November 7, 2018 and January 8, 2019.  (See IHO 2019 Decision at 1.)  On February 20, 2019, IHO Murphy issued a 72-page detailed decision in favor of Westhampton finding that the District had offered A.K. a FAPE in the LRE for the 2018-2019 school year, and dismissed Plaintiffs' claims.[5]  (See id. at 50-76.)  The IHO 2019 Decision upheld: (1) the May 2018 IEP, which recommended that A.K. be placed in a special class with a student-teacher ratio of 12:1+1 and with a focus on functional academics and vocational skills (also described as a "life skills" program) (see id. at 5, 50-72); and

---

[5]  Prior to filing their September 2018 due process complaint, Plaintiffs had filed two due process complaints -- one in March 2018 and another in June 2018 -- alleging that the District had failed to provide A.K. with a FAPE for the 2017-2018 and 2018-2019 school years.  (See SRO 2019 Decision at 3 n.2, 4.)  With the parties' agreement, IHO Murphy, consolidated the September 2018 due process complaint with a related remanded matter from Plaintiffs' March and June 2018 due process complaints.  (See IHO 2019 Decision at 4 n.1.)  The central issue of the consolidated matter was whether the District failed to offer A.K. a FAPE for the 2018-2019 school year.  (See SRO 2019 Decision at 7.)

(2) the placement of A.K. in an out-of-district location that had the "life skills" program, since Westhampton did not have that recommended program (see id. at 57).

Elucidating her decision, IHO Murphy referred to numerous prior administrative decisions finding that Westhampton was not legally mandated to educate A.K. in the District or to create a program within the District, if his needs could not be met with the use of supplementary aids and services. (See id. at 51.)  IHO Murphy highlighted that, for the prior three years, the Parents had not disputed A.K.'s needs or the severity of his disability justifying his removal from general education.  (See id. at 52.)  Yet, now and solely to support their position that A.K. be educated within the District, the Parents were challenging A.K.'s removal from the general education environment.[6]  (See id.)  IHO Murphy found the Parents' challenge to be an "unavailing attempt to relitigate the same issue under a new legal theory." (Id.)  She explained: (1) the decision that A.K. was a student with a severe disability, as defined in the Commissioner's Regulations, was made "long before the 2018/2019 school year" (id. at 61); (2) the Parents have not previously challenged that

---

[6]  The IHO noted the "intense animosity" between the parties as demonstrated by Mr. K threatening to petition the Department of Education to request the removal of Dr. Austin from her job for her failure to create the Parents' requested "hybrid program." (IHO 2019 Decision at 46.)

13

decision, nor had they included this contention in their due process complaint (id.); and (3) thus, "[t]he inquiry here is the same as in every other request for due process -- a procedural and substantive review of the student's IEP and whether the District has complied with the requirements of the IDEA" (id. at 52).  In sum, IHO Murphy rejected the Parents' request that the District implement the proposed "hybrid program," and concluded that "the District . . . sustained its burden to prove[] that A.K. was offered a [FAPE] in the least restrictive environment to meet his needs" for the 2018-2019 school year.  (Id. at 23, 50.)

### 2. SRO Decision

Plaintiffs administratively appealed the IHO 2019 Decision to the N.Y.S. Education Department's Office of State Review, asserting that the IHO erred when she found that the District offered A.K. a FAPE for the 2018-2019 school year.  (See Compl. ¶ 31.)  On April 17, 2019, following a thorough examination of the record and of the IHO 2019 Decision, SRO Harrington dismissed with prejudice Plaintiffs' appeal because: (1) Plaintiffs "fail[ed] to comply with the practice regulations governing appeals to the Office of State Review[ ]"; and (2) IHO Murphy's decision was supported by the evidence.  (SRO 2019 Decision at 27-32, 50; Compl. ¶ 34.)

More specifically, the Plaintiffs' appeal was dismissed upon procedural grounds due to Plaintiffs' lack of compliance with

practice requirements in the form and content of their request for review.  (See SRO 2019 Decision at 31 (noting the Parents had been cautioned about their continued failure to comply with practice regulations in their four prior appeals).)  The SRO also explained that the Parents' decision to "reframe some of the issues presented on appeal in the request for review makes it difficult -- if not impossible at times -- to discern the IHO's specific 'findings, conclusions, and orders to which exceptions are taken' . . . ." (Id. at 29 ("Perhaps even more egregious, however, is the parent's failure in the request for review . . . to 'clearly specify the reasons for challenging the [IHO's] decision.' . . . Instead, the parent points to the district's alleged failures or errors as a basis for the appeal." (citations omitted; brackets in original))); see also id. (further noting the Parents' complete failure to provide citations to the record on appeal and identify the relevant page numbers in the hearing decision, transcript, and exhibits).)  Nonetheless, the SRO evaluated the merits of Plaintiffs' appeal.

        In assessing the merits of the Parents' arguments, the SRO agreed with the IHO's conclusion that the evidence in the hearing record demonstrated that A.K.'s May 2018 IEP provided him with a FAPE.  SRO Harrington examined the issues as stated in Plaintiffs' Request for Review, i.e.:

> whether the [D]istrict denied the student a
> FAPE by failing to consider the student's
> alternate assessment testing results in
> developing the present levels of performance,
> by failing to provide the student with access
> to the general education curriculum, by
> failing to align the student's annual goals
> with grade-level learning standards, and by
> recommending a 12:1+1 special class placement
> life skills program located within an out-of-
> district public school as the student's [LRE].

(Id. at 32 (citing Request for Review).) Considering these issues in light of the record evidence, the SRO found that: (1) the result of the three successive CSE meetings, and the discussions held therein, were sufficient to support the May 2018 CSE decision recommending an out-of-district public school placement for implementing A.K.'s IEP, which was appropriate; and (2) the District was not required to create a program to meet its LRE obligations. (See id. at 48.) Accordingly, finding no reason to disturb the IHO's conclusion that the 12:1+1 special class placement in a "life skills" program located in an out-of-district public school offered A.K. a FAPE in the LRE for the 2018-19 school year, the SRO dismissed the Parents' appeal. (Id. at 50.)


B. The Instant Action

On June 5, 2019, Plaintiffs commenced this action seeking review of the SRO 2019 Decision pursuant to the IDEA, which provides that an SRO's final decision may be challenged in federal court. (See Compl. ¶ 35); see also 20 U.S.C. § 20 U.S.C. §

1415(i)(2)(A).   Additionally, Plaintiffs asserted claims under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 et seq.; and 42 U.S.C. § 1983 ("Section 1983").   (See Compl.)   On September 26, 2019, Defendants moved to dismiss Plaintiffs' IDEA claims for lack of subject matter jurisdiction, and Plaintiffs' claims under the ADA, Rehabilitation Act, and Section 1983 for lack of subject matter jurisdiction and for failure to state a claim (hereafter, the "Dismissal Motion").   (See Defs. Mot. to Dismiss, ECF No. 16.) The Court adopted the Report and Recommendation of Judge Steven I. Locke, which recommended: (1) denying Defendants' Dismissal Motion for lack of subject matter jurisdiction; and (2) granting Defendants' motion for judgment on the pleadings as to Plaintiffs' ADA, Rehabilitation Act, and Section 1983 claims.   See Killoran v. Westhampton Beach Sch. Dist., No. 19-CV-3298, 2020 WL 4743189 (E.D.N.Y. July 27, 2020), adopting report and recommendation, 2020 WL 4740498 (June 24, 2020).   This Court further stated that "Plaintiffs' claim for judicial review of the SRO decision pursuant to the IDEA will proceed."   Id.   On August 11, 2020, Plaintiffs filed the instant Motion seeking to overturn the administrative decisions, which the Defendants oppose.   (See Opp'n, ECF No. 40.)

DISCUSSION

I.   Standard of Review

A district court's role in "'reviewing state educational decisions under the IDEA is circumscribed.'" T.Y. & K.Y. ex rel. T.Y. v. N.Y. City Dep't of Educ., 584 F.3d 412, 417 (2d Cir. 2009) (quoting Gagliardo, 489 F.3d at 112). "Although the district court must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence,' Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 (2d Cir. 1997), the Supreme Court has cautioned that such review 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" Gagliardo, 489 F. 3d at 112-13 (quoting Rowley, 458 U.S. at 206). Indeed, the Court "'must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" T.Y., 584 F.3d at 417 (quoting A.C. ex rel. M.C. v. Bd. of Educ., 553 F.3d 165, 171 (2d Cir. 2009)).

The Court also acknowledges that IDEA claims can often be resolved upon summary judgment motion because, although the Court is empowered to hear new evidence if necessary, the Court has the benefit of the administrative record, and it must afford a certain degree of deference to the administrative findings.

18

T.Y., 584 F.3d at 418.  In fact, "[u]nlike with an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat a motion for summary judgment in the IDEA context."  J.S. v. Scarsdale Union Free Sch. Dist., 826 F. Supp. 2d 635, 658 (S.D.N.Y. 2011) (citations omitted). "Instead, summary judgment in IDEA cases such as this is 'in substance an appeal from an administrative determination, not a summary judgment.'"  Id. (quoting Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005)).

II.  Issues for Judicial Review

In moving for summary judgment, Plaintiffs claim that Westhampton "failed to perform any of the 'essential dynamics' necessary to ensure the facilitation of a FAPE that was 'appropriately ambitious.'"  (Support Memo at 2.)  Specifically, Plaintiffs argue that the District failed to: develop A.K.'s present levels of performance from appropriate assessments; afford A.K. with access to the general education curriculum; align A.K.'s goals with grade-level learning standards; and place A.K. in the LRE.  (Id. at 2-11.)  In opposition, Defendants contend that this Court lacks subject matter jurisdiction over Plaintiffs' IDEA claim due to Plaintiffs' failure to exhaust administrative remedies.  (Opp'n at 8-15.)  Defendants further argue that even if the Court finds it has subject matter jurisdiction over Plaintiffs' claim, summary judgement should be denied because Plaintiffs have

failed to meet their burden and show by a preponderance of the evidence that the IHO and SRO erred in dismissing Plaintiffs' claim. (See id. at 15-29.) For the reasons set forth herein, Plaintiffs' Motion is DENIED.

A. Subject Matter Jurisdiction

As a threshold matter, Defendants contend that the SRO dismissed Plaintiffs' administrative appeal with prejudice, in part, for failure to comply with the form requirements of 8 N.Y.C.R.R. Part 279; as a result, the instant appeal should be dismissed for lack of subject matter jurisdiction. (See id. at 8-15.) The Court disagrees.

It is well settled that the IDEA requires that an aggrieved party exhaust all available administrative remedies prior to appealing a case to federal court. See 20 U.S.C. § 1415(i)(2)(A). In New York, exhaustion requires engaging in both an initial IHO hearing and an appeal to the SRO. See R.S. v. Bedford Cent. Sch. Dist., 899 F. Supp. 2d 285, 288 (S.D.N.Y. 2012). Hence, "disputes related to the education of disabled children" are channeled "into an administrative process that c[an] apply administrators' expertise in the area and promptly resolve grievances." Cave v. East Meadow Union Free School Dist., 514 F.3d 240, 245-46 (2d Cir. 2008) (quoting Polera v. Bd. of Educ., 288 F.3d 478, 487 (2d Cir. 2002)). A party's failure to exhaust administrative remedies deprives the party of the right to appeal

a case in federal court because it "deprives the court of subject matter jurisdiction." Cave, 514 F.3d at 246 (citing Polera, 288 F.3d at 483.)

Notably, the Court has already rejected Defendants' argument that the Court lacks subject matter jurisdiction over Plaintiffs' claim for failure to exhaust administrative remedies. See Killoran, 2020 WL 4740498, at *4 (recommending denying District's motion to dismiss Parents' IDEA claim for lack of subject matter jurisdiction where Plaintiffs' administrative appeal was dismissed in part because of their failure to comply with practice regulations), report and recommendation adopted by 2020 WL 4743189.  The Court stated, "[w]hereas courts in this Circuit have deemed plaintiffs' procedural errors, 'such as failure to timely serve or file a petition for SRO review[,]' a failure to exhaust administrative remedies, procedural violations of 'form requirements' do not similarly constitute an exhaustion failure."  Id. at *5 (citing J.E. v. Chappaqua Cent. Sch. Dist., No. 14-CV-3295, 2015 WL 4934535, at *4 (S.D.N.Y. Aug. 17, 2015) (noting that SRO "judgments rendered solely on the basis of easily corrected procedural errors or mere technicalities are generally disfavored" and rejecting argument that plaintiffs had failed to exhaust administrative remedies where the SRO had dismissed their appeal for procedural violations of form requirements) (cleaned up)).

21

Moreover, despite dismissing Plaintiffs' claims based upon procedural defects, SRO Harrington, nonetheless addressed the merits of Plaintiffs' claims, rendering a decision "on alternative grounds" on the substance of those claims. (SRO 2019 Decision at 50.) "It is illogical to conclude that Plaintiffs have failed to exhaust their administrative remedies when their claims were fully assessed on the merits by the SRO. . . . It should be of no consequence that [the] SRO[']s decision to dismiss on the merits may not have been the only line of reasoning upon which [s]he based h[er] dismissal." J.E., 2015 WL 4934535, at * 5. Thus, in light of SRO Harrington's substantive analysis and determination, her nominal dismissal of Plaintiffs' claims on procedural grounds does not preclude the Court from asserting subject matter jurisdiction over Plaintiffs' appeal. Concluding the Plaintiffs have exhausted all administrative remedies prior to seeking judicial relief, the Court has subject matter jurisdiction over Plaintiffs' claims.[7]

---

[7] The Court notes that the scope of the inquiry of the IHO, and therefore also of the SRO and this Court, is limited to matters either raised in the Plaintiffs' due process complaint or agreed to by the defendant. See 20 U.S.C. § 1415(f)(3)(B). Further, "issues that were decided by the IHO and not appealed or cross-appealed by the party against which they were decided are binding against that party, and on the SRO and this Court, as to that party." C.H. v. Goshen Cent. Sch. Dist., No. 11-CV-6933, 2013 WL 1285387, at *9 (S.D.N.Y. Mar. 28, 2013); 8 N.Y.C.R.R. § 200.5(j)(5)(v); see also 8 N.Y.C.R.R. § 279.8(c)(4) ("any issue not identified in a party's request for review, answer, or answer with cross-appeal shall be deemed abandoned and will not be addressed by a State Review Officer.") Therefore, this Court will

B. IDEA Claim

In deciding Plaintiffs' IDEA claim, i.e., whether A.K.'s IEP is adequate and whether Defendants provided a FAPE for A.K. for the 2018-2019 school year, the Court engages in a two-part inquiry. R.E., 694 F.3d at 189–90. First, the Court determines "whether the state has complied with the procedures set forth in the IDEA." Id. (quoting Cerra v. Pawling Cent. School Dist., 427 F.3d 186, 192 (2d Cir. 2005)). Second, the Court assesses the substantive adequacy of the IEP by determining "whether the IEP developed through the Act's procedures '[is] reasonably calculated to enable the child to receive educational benefits.'" Cerra, 427 F.3d at 192 (quoting Rowley, 458 U.S. at 206-07). "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress[ion], not regression, and if the IEP affords the student an opportunity greater than mere trivial advancement." Id. at 195 (cleaned up). Deference to the state administrative agencies, which have special expertise in making judgments concerning student progress, "is particularly important when assessing an IEP's substantive adequacy." Id.

Here, in challenging the IHO 2019 Decision and SRO 2019 Decision, Plaintiffs argue that the District failed to: (1) derive

---

address only those issues that were both properly raised in Plaintiffs' due process complaint and appealed to the SRO.

A.K.'s present levels of performance from appropriate assessments; (2) afford A.K. with access to the general education curriculum; (3) align A.K.'s goals with grade-level learning standards; and (4) place A.K. in the least restrictive learning environment. (See Support Memo at 8-17.)  The Parents failed to designate these alleged failures as either procedural or substantive.  The Court will consider as procedural Plaintiffs' allegation that the District failed to consider A.K.'s alternate assessment testing results in developing his present levels of performance, since it concerns the sufficiency of the procedures the CSE followed in developing A.K.'s IEP.  See P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ. (Region 4), 819 F. Supp. 2d 90, 105 (E.D.N.Y. 2011) ("A procedural violation generally concerns the process by which the IEP and placement offer was developed and conveyed . . . ."), aff'd, 526 F. App'x. 135 (2d Cir. 2013).  Conversely, the Court will consider as substantive Plaintiffs' remaining allegations, which concern the appropriateness of the program offered to A.K. See id. ("[O]n the other hand a substantive violation arises from a deficiency in the programming being offered." (citations omitted)).

   1. Procedural Adequacy

        Plaintiffs contend that the District's alleged failure to consider A.K.'s alternate assessment testing results in developing his present levels of performance deprived him of a

FAPE.  (Support Memo at 8-9.)  Specifically, Plaintiffs argue that
the record shows that the District failed to utilize A.K.'s
"alternate assessment testing results", or "any other form of
conventional assessment or benchmarking" towards the discernment
of his present levels of performance, in violation of New York
state regulations.[8]  (Id. at 8.)

        Among other things, a student's IEP should include his
present levels of academic achievement and functional performance.
See 20 U.S.C. § 1414(d).  Specifically, in developing a child's
IEP, the CSE must consider: "the results of the initial or most
recent evaluation; the student's strengths; the concerns of the
parents for enhancing the education of their child; the academic,
developmental and functional needs of the student, including, as
appropriate, the results of the student's performance on any
general State or districtwide assessment programs. . . ."  8
N.Y.C.R.R. § 200.4(d)(2) (emphasis added); see also §
200.4(f)(1)(iv) (same for annual review of IEP).

        Importantly, under the IDEA, not every procedural error
in developing an IEP renders it legally inadequate.  See Grim v.
Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003).  A

---

[8]  Notably, though Plaintiffs raise concerns with the District's
failure to include the results of A.K.'s alternative assessment
test results in his IEP, the Parents have not challenged A.K.'s
actual functioning levels as described in evaluations utilized in
generating his IEP.  (See IHO 2019 Decision at 11 n.4.)

procedural violation will result in the denial of an appropriate public education only if the procedural inadequacy: "impeded the child's right to a [FAPE]"; "significantly impeded the parents' opportunity to participate in the decision-making process"; or "caused a deprivation of educational benefits." R.E., 694 F.3d at 190 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). Additionally, "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." Id. (citation omitted).

Here, it is undisputed that the CSE that convened in March, April and May 2018 did not consider the results of A.K.'s 2015-2016 or 2016-2017 alternate assessment testing in the development of his present levels of performance. (See SRO 2019 Decision at 38.) Yet, in this instance, those failures do not rise to the level of a FAPE violation. [9] See R.B. v. N.Y.C. Dep't of Educ., 15 F. Supp. 3d 421, 431 (S.D.N.Y. 2014) ("[T]he absence of one single measure should not itself render an IEP invalid, so long as the CSE team otherwise has sufficient information about the student to determine the student's educational needs." (citation and quotation marks omitted)). First, the hearing record

---

[9] Notably, the Special Education Quality Assurance Regional Office rejected a similar complaint Plaintiffs had filed with the State regarding the District's alleged failure to utilize A.K.'s N.Y.S. Alternate Assessment ("NYSAA") results in the development of his 2017-2018 IEP. (See SRO 2019 Decision at 40.)

contains evidence that the CSE sufficiently considered numerous evaluations, reports and observations in assessing AK's skill levels. For example, at the March 2018 CSE meeting, A.K.'s special education teacher, who had administered the NYSAA, shared information regarding A.K.'s performance on the test. (See March 2018 CSE at 23.) Second, the CSE members spent substantial time reviewing and revising the present levels of performance in the 2017-2018 IEP with significant input from the Parents. Moreover, both A.K.'s mother and her educational consultant indicated agreement with those performance levels. (See April 2018 CSE at 37-190.) Further, A.K.'s special education teacher and related service providers reviewed the IEP goals and the progress A.K. had made during the 2017-18 school year. (See id.) Third, both the District special education teacher and Dr. Austin testified that the NYSAA results were of limited valuing i.e., merely informing the District whether the student was meeting assessment standards.[10] (See Nov. 20, 2018 Hr'g Tr., ECF No. 32-8, at 157-158.) Finally, the hearing record reflects that the subject CSE reviewed objective intelligence testing, including the Stanford-Binet Test and the Wechsler Individual Achievement Test to determine A.K.'s present levels, as well as a Vineland assessment

---

[10]   According to Dr. Austin's testimony, A.K.'s NYSAA testing results for the 2016-2017 school year reflected that he was not meeting the standards for alternate assessment in ELA and Math. (Id. at 165-66.)

of his adaptive functioning.  (See id. at 78, 191-92; May 2018 IEP.)

Thus, based upon the record evidence, the Court finds that the CSE considered sufficient evaluative information in developing A.K.'s present levels of performance, and therefore their failure to consider A.K.'s 2015-2016 and 2016-2017 NYSAA test results did not render A.K.'s IEP invalid or deny A.K. a FAPE. See D.B. v. N.Y.C. Dep't of Educ., 966 F. Supp. 2d 315, 331 (S.D.N.Y. 2013) (finding school district's failure to perform an updated evaluation did not deny a FAPE where the CSE had other "sufficient and accurate information to understand the [s]tudent's present levels of performance"); P.L. v. N.Y. Dep't of Educ., 56 F. Supp. 3d 147, 160 (E.D.N.Y. 2014) (noting that failure to conduct a vocational assessment "constituted a procedural violation" but that failure did not result in the denial of a FAPE where the CSE had sufficient evaluative information). Accordingly, the Court declines to grant Plaintiffs' Motion on the grounds of alleged procedural inadequacy.

  2. Substantive Adequacy

The Court next turns to the substantive adequacy of the IEP and considers whether it was "reasonably calculated to enable [A.K.] to receive educational benefits."  M.H., 685 F.3d at 242. An IEP is substantively adequate if it "provide[s] personalized instruction with sufficient support services to permit the child

28

to benefit educationally from that instruction." Rowley, 458 U.S. at 203. "Although the IDEA 'does not . . . require states to develop IEPs that maximize the potential of handicapped children,' the IEP 'must aim to enable the child to make progress.'" F.L. v. Bd. of Educ. of the Great Neck U.F.S.D., 274 F. Supp. 3d 94, 119 (E.D.N.Y. 2017) (first quoting S.W. v. N.Y. Dep't of Educ., 92 F. Supp. 3d 143, 159 (S.D.N.Y. 2015); then quoting Endrew F. ex rel. Joseph F. v. Douglas County Sch. Dist. RE-1, 137 S. Ct. 988, 999 (2017)), aff'd, 735 F. App'x 38 (2d Cir. 2018) (summary order). Further, "as decisions on substantive adequacy implicate educational policy judgments, administrative determinations on these matters are entitled to a greater degree of deference by the court." B.K. v. N.Y.C. Dep't of Educ., 12 F. Supp. 3d 343, 368 (E.D.N.Y. 2014) (citing M.H., 685 F.3d at 244 ("[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether an IEP was developed according to the proper procedures.")). Accordingly, a court "must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan," without "impermissibly meddling in state educational methodology." Walczak, 142 F.3d at 130 (internal quotation marks omitted).

Having thoroughly reviewed the hearing record, for the reasons discussed below, the Court concurs with the SRO's

conclusion that A.K.'s IEP was reasonably calculated to enable A.K. to receive educational benefits and, therefore, was substantively adequate.

### a.   Access to the General Education Curriculum

Plaintiffs argue that the District denied A.K. access to the general education curriculum based upon the District's belief that the general education curriculum could not be modified to meet the needs of an "alternately assessed special education student." (Support Memo at 9-10) (internal quotations omitted). The Parents' position that the District must educate A.K. pursuant to the general education curriculum is misguided.

The IDEA requires that a student's IEP states "the child's present levels of academic achievement and functional performance," including "how the child's disability affects the child's involvement and progress in the general education curriculum." 20 U.S.C. § 1414(d)(1)(A)(i)(I); see also 34 C.F.R. § 300.320(a)1(i); 8 N.Y.C.R.R. § 200.4(d)(2)(i). An IEP must also describe the "special education and related services . . . that will be provided" so that the child may "advance appropriately toward attaining the annual goals" and, when possible, "be involved in and make progress in the general education curriculum." Endrew F., 137 S. Ct. at 994 (2017) (quoting § 1414(d)(1)(A)(i)(IV)).

"[T]he preeminent requirement of [the] IDEA is that the District individually tailor a program that is sufficiently

challenging for the unique needs of each child. [The] IDEA requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." F.L., 735 F. App'x at 40 (quoting Endrew F., 137 S. Ct. at 1000-01). There is no "bright-line rule" determining "what 'appropriate' progress" means; rather, "[t]he adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." Endrew F., 137 S. Ct. at 1001; see also M.H., 685 F.3d at 245 ("The IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP.") Notably, the statute ensures an "appropriate" education, but "not one that provides everything that might be thought desirable by loving parents." Walczak, 142 F.3d at 132 (internal quotation marks omitted).

Having independently reviewed the record, the Court finds that A.K.'s IEP was sufficiently tailored to meet his individual needs and enable him to "make progress appropriate in light of [his] circumstances." Endrew F., 137 S. Ct. at 1000-01. It is undisputed that A.K. was identified as an alternately assessed student. (See IHO 2019 Decision at 58.)[11] Dr. Austin

---

[11] Plaintiffs appear to challenge this point on appeal; however, because this issue was not raised in their due process complaint or on appeal to the SRO, it is deemed abandoned. See supra, at note 7. As noted by IHO Murphy, the determination that A.K. is a student "with a severe disability as defined in the Commissioner's Regulations and whose demonstrated cognitive ability prevented him

testified that the IQ range for students placed in the District's high school Regents track program is between 102 and 110.  (See Dec. 11, 2018 Hr'g Tr., ECF No. 32-10, at 124-25.)  With an IQ of 49, A.K.'s placement in the Regents track program would be inappropriate since: he scored below the first percentile when compared with his same-aged peers (see May 2018 IEP at 1); he scored below the first percentile in both verbal and non-verbal assessments and in all components of an assessment of his adaptive behavior, including communication, daily living skills, and socialization (see id. at 2); and, in achievement testing, he scored below the first percentile in listening comprehension, math problem solving, mathematics, numerical operations, and reading comprehension (id. at 2-3).  Additionally, A.K.'s most recent psychological evaluation states that he "continues to need to develop activities of daily living skills and needs to be with similar peers to be included in skill-appropriate activities." (IHO 2019 Decision at 12-13.)

During the March 2018 CSE meeting, the Parents, their advocate, and A.K.'s then-current special education teacher, urged Dr. Austin to educate A.K. in-district.  (See March 2018 CSE at

---

from completing the grade level general education curriculum even with program modification and adaptations" was made long before the 2018-2019 school year and was not previously challenged by the Parents.  (See IHO 2019 Decision at 61.)  Moreover, there is no record evidence that this determination of severe disability as to A.K. has changed.  (See id. at 62.)

150-202.)  The District's special education teacher questioned the appropriateness of modifying a high school Common Core curriculum that was Regents track to accommodate A.K., who was reading at a "first[-]grade level."  (Id. at 189-92.)  Both Dr. Austin and the District's special education teacher expressed concern about modifying the curriculum to that extent while maintaining the "integrity of the program," and believed that doing so would be "educationally unsound."  (Id. at 190-91.)

Discussion regarding the possible modification of the general education curriculum to meet A.K.'s needs continued during the April and May 2018 CSE meetings.  (See April 2018 CSE at 11-23; May 2018 CSE at 98-99.)  Dr. Austin responded to the Parents' concerns about A.K.'s access to the general education content standards and reviewed the federal and state guidance documents they submitted, but found that certain aspects of the general education curriculum were "not appropriate" based upon A.K.'s current level.  (See May 2018 CSE at 99.)

The Court agrees with the SRO's well-reasoned decision and finds that the District's IEP was "reasonably calculated" to enable A.K. to receive educational benefits.  See Endrew at 1001.  Notably, the IDEA does not require regular education instructors "to modify the regular education program beyond recognition."  P. ex rel. Mr. P. v. Newington Bd. of Educ., 512 F. Supp. 2d 89, 107, (D. Conn. 2007) (quoting Daniel R.R. v. State Bd. of Educ., 874

F.2d 1036, 1048 (5th Cir. 1989)); see also Daniel R.R., 874 F.2d at 1048-49 ("[M]ainstreaming would be pointless if we forced instructors to modify the regular education curriculum to the extent that the handicapped child is not required to learn any of the skills normally taught in regular education.  The child would be receiving special education instruction in the regular education classroom; the only advantage to such an arrangement would be that the child is sitting next to a nonhandicapped student.").  Therefore, the District was not required, nor would it have been appropriate, to modify its Regents track high school curriculum to meet A.K.'s needs.  Accordingly, the Court finds that A.K.'s removal from the general education curriculum did not violate his right to a FAPE.

    b. Annual Goals/Grade-Level Learning Standards

    Plaintiffs also argue that the District failed to align A.K.'s goals with grade-level learning standards, thereby depriving him of a FAPE.  (Support Memo at 11-17.)  The Court disagrees.

    An IEP must include a written "statement of measurable annual goals, including academic and functional goals designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum, and meet each of the child's other educational needs that result from the child's disability."  20

U.S.C. § 1414(d)(1)(A)(i)(II); see also 8 N.Y.C.R.R. § 200.4(d)(2)(iii). These annual goals must include "evaluative criteria, evaluation procedures and schedules to be used to measure progress toward meeting the annual goal . . . ." 8 N.Y.C.R.R. § 200.4(d)(2)(iii)(b); see also 20 U.S.C. § 1414(d)(1)(A)(i)(III). Additionally, for alternately assessed students, state regulations require that the IEP include "a description of the short-term instructional objectives and/or benchmarks that are the measurable intermediate steps between the student's present level of performance and the measurable annual goal." 8 N.Y.C.R.R. § 200.4(d)(2)(iv).

Here, A.K.'s May 2018 IEP included twenty-six annual goals with corresponding short-term objectives that "were aligned with, and designed to address, [A.K.]'s identified needs . . . ." (SRO 2019 Decision at 41; see May 2018 IEP at 10-15.) Each annual goal included the requisite "evaluative criteria," "evaluation procedures," and "schedules to measure progress" in accordance with state regulations. (May 2018 IEP at 9-15; see also 8 N.Y.C.R.R. § 200.4(d)(2)(iii)(b).) The hearing record demonstrates that the May 2018 CSE reviewed and discussed A.K.'s progress on his then-current annual goals with input from both Parents, who expressed agreement with the annual goals created for the upcoming school year. (See May 2018 CSE at 37-40.)

To the extent Plaintiffs contend that "students [like A.K.] who are severely cognitively disabled (aka: alternately assessed), are supposed to have their goals aligned with grade-level learning standards" that argument is unavailing. (Reply, ECF No. 42, at 12 (footnote omitted); see also Support Memo at 11.) While the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," Endrew F., 137 S. Ct. at 1001, the child's "educational program need not include 'grade-level advancement' if that kind of progress is not 'a reasonable prospect' for the particular child." F.L., 735 F. App'x at 40 (quoting Endrew F., 137 S. Ct. at 1000). Moreover, although "[w]hen a child is fully integrated in the regular classroom, as the [IDEA] prefers, [which] typically means . . . providing a level of instruction reasonably calculated to permit advancement through the regular curriculum," "with respect to a child[, like A.K,] who is not fully integrated in the regular classroom and not able to achieve on grade level," "his IEP need not aim for grade-level advancement," but "must be appropriately ambitious in light of his circumstances," and set forth "challenging objectives." Endrew F., 137 S. Ct. at 1000. Based upon the record evidence, the Court finds no reason to disturb the SRO's finding that the goals contained in A.K.'s 2018-2019 IEP were appropriately aligned with A.K.'s needs and fulfilled the requirements of the IDEA, and

36

federal and state regulations.  See Grim, 346 F.3d at 381 ("[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative decisions").  Hence, Plaintiffs' Motion is denied on the grounds that the District failed to align A.K.'s goals with grade-level learning standards.

c.   Least Restrictive Environment

Finally, Plaintiffs maintain that the District's recommendation of a 12:1+1 special class placement in a life skills program located within an out-of-district public school was not A.K.'s least restrictive environment ("LRE").  (See Support Memo at 11-12.)  They argue that the District pre-determined A.K.'s educational placement without conducting a meaningful analysis regarding its genuine ability to educate A.K. internally.[12]  (Id. at 13-17.)  The record does not support that position.

The law expresses a strong preference for children with disabilities to be educated, "to the maximum extent appropriate," together with their non-disabled peers.  Walczak, 142 F.3d at 122

---

[12] Similarly, Plaintiffs' contention that the CSE failed to utilize any peer-based research in formulating A.K.'s IEP does not support their argument that the CSE's recommended placement did not represent A.K.'s LRE.  (Cf. Support Memo at 20.)  There is no absolute requirement that an IEP be supported by peer-reviewed research, but only that it be supported to the "extent practicable."  See 20 U.S.C. § 1414(d)(1)(A)(i)(IV); 34 C.F.R. § 300.320(a)(4); 8 N.Y.C.R.R. § 200.4(d)(2)(v)(b).

(quoting 20 U.S.C. § 1412(5)(A).)  To that end, special education services "must be provided in the least restrictive setting consistent with a child's needs.  Only 'when the nature or severity' of a child's disability is such 'that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily' should a child be segregated." Id. (quoting 20 U.S.C. § 1412(a)(5)).  Thus,

> [w]hile mainstreaming is an important objective, [courts] are mindful that the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students. Therefore, under the [IDEA], "where the nature or severity of the handicap is such that education in regular classes cannot be achieved satisfactorily, mainstreaming is inappropriate.

Id. (citing Briggs v. Bd. of Educ., 882 F.2d 688, 692 (2d Cir. 1989)).  New York regulations require that

> [t]he placement of an individual student with a disability in the least restrictive environment shall: (1) provide the special education needed by the student; (2) provide for education of the student to the maximum extent appropriate to the needs of the student with other students who do not have disabilities; and (3) be as close as possible to the student's home.

8 N.Y.C.R.R. § 200.1(cc).  State regulations further require that school districts ensure that a continuum of alternative placements be available to meet the needs of students with disabilities for special education and related services.  See 8 N.Y.C.R.R. § 200.6;

38

see also T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 165 (2d Cir. 2014) (stating a school district "cannot avoid the least restrictive environment requirement just by deciding not to operate certain types of educational environments; instead, it must provide a continuum of alternative placements that meet the needs of the disabled children that it serves."). However, "a school district need not itself operate all of the different educational programs on this continuum of alternative placements. The continuum may instead include free public placements at educational programs operated by other entities, including other public agencies or private schools." T.M., 752 F.3d at 165 (citing 34 C.F.R. § 300.552 note (1998); further citation omitted).

To determine whether an IEP places a student in the LRE, the Second Circuit has adopted a two-prong test: under prong one, the court first considers whether education in the general classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given student; if not, under prong two, the court then considers whether the school has mainstreamed the student to the maximum extent appropriate (hereafter, the "Mainstreaming Test"). See P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Educ., 546 F.3d 111, 120 (2d Cir. 2008) (explicitly endorsing two-pronged mainstreaming test adopted by the Third, Fifth, Ninth, Tenth, and Eleventh Circuits for determining whether an IEP places a student in the LRE).

When determining the first prong of the Mainstreaming Test, courts consider:

> (1) whether the district made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students in the class.

Id. (quoting Oberti v. Clementon Sch. Dist., 995 F.2d 1204, 1217-18 (3d Cir. 1993)); see id. at 120 (noting that "this list of factors is not exhaustive; courts facing these cases must engage in an individualized and fact-specific inquiry into the nature of the student's condition and the school's particular efforts to accommodate it"). "If, after considering these factors, the court determines that the school district was justified in removing the child from the regular classroom and providing education in a segregated, special education class, the court must consider the second prong of the [M]ainstreaming [T]est—whether the school has included the child in school programs with nondisabled children to the maximum extent appropriate." Id. (quoting Oberti, 995 F.2d at 1218). "In this regard, courts should evaluate whether the child has been included in school programs—including non-academic components of the school day like lunch and recess—alongside children without disabilities to the maximum extent appropriate."

J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch. Dist., 777 F.
Supp. 2d 606, 640 (S.D.N.Y. 2011) (citing Newington, 546 F.3d at
120.)  Having independently reviewed the hearing record, the Court
finds that the SRO properly applied Newington's Mainstreaming Test
and correctly concluded that the District's recommendation of
placing A.K. in an out-of-district 12:1+1 special life skills
program was in the least restrictive environment.[13]

First, in determining whether A.K. can be educated
satisfactorily in a general education class with supplemental aids
and services, the objective evidence demonstrates he cannot.  A.K.
has low "cognitive functioning" and significant needs in "daily
living, communication, problem solving, and functional independent
skills."  (IHO 2019 Decision at 44.)  Moreover, the CSE considered
A.K.'s placement options, including "pushing [A.K.] into general
education classes and the extent to which modifications to the
curriculum would be necessary or appropriate" to meet A.K.'s needs;
it also considered the Parents' "preferred placement option" --
creating a "hybrid program."  (SRO 2019 Decision at 47.)  However,
based upon A.K.'s then-current levels of performance, the CSE

---

[13] Plaintiffs attempt to distinguish Newington from the instant
case and contend that the SRO should have applied the Sixth
Circuit's approach to determine whether A.K.'s IEP placed him in
the LRE.  (Reply at 17-19 (citing Roncker v. Walter, 700 F.2d 1058
(6th Cir. 1983).)  However, the Second Circuit has specifically
declined to adopt the Sixth Circuit's approach.  See Newington,
546 F.3d at 119 & n.3.

determined that these placement options were "not appropriate." (May 2018 CSE at 99.)   Rather, informing the Parents that the District did not have an "alternatively assessed program" at the high school level that would address A.K.'s functional needs, the CSE recommended an out-of-district program in the Middle Country School District, which included those necessary components. (April 2018 CSE at 23, 122.)   In its decision-making process, the May 2018 CSE was further guided by prior administrative decisions regarding A.K.'s 2016-2017 and 2017-2018 academic years, i.e., that the 12:1+1 special class placement in a life skills program in an out-of-district public school offered A.K. a FAPE in the LRE.[14]   (See SRO 2019 Decision at 46.)   Notably, SRO Harrington concluded that the evidence in the hearing record demonstrated that A.K.'s needs had not changed from the previous school years when similar recommendations were made.  (See id.)  Therefore, the Court finds that the hearing record sufficiently supports the SRO's conclusion that the May 2018 CSE's decision to recommend an out-of-district public school to implement A.K.'s IEP was appropriate and that the District was not required to create a program to meet its LRE obligations.  See T.M., 752 F.3d at 166 (stating the IDEA does not require a school district to "create a new [ ] program from scratch just to serve the needs of one disabled child.")

---

[14]   Those administrative decisions were recently upheld by this Court.  See A.K., 2021 WL 621236, adopted by 2021 WL 665277.

As to Plaintiffs' argument that the District predetermined A.K.'s placement, thereby violating its legal obligation to educate A.K. "as close to home as possible", it is without merit. (See Support Memo at 13-17.) While parents have a procedural right in the educational placement of their child, "i.e., the academic program to which the student is assigned," they "are not . . . procedurally entitled to participate in the decision regarding school placement," i.e., "the specific location to which the student is assigned." F.L. ex rel. F.L. v. N.Y.C. Dep't of Educ., No. 11-CV-5131, 2012 WL 4891748, at *11 (S.D.N.Y. Oct. 16, 2012) (citing T.Y., 584 F.3d at 420)). The Court understands and appreciates Plaintiffs' desire to have A.K. educated within their home district, but the law does not require the District to place A.K. in the District the Parents' request;[15] it merely requires that the District make a recommendation that is "reasonably calculated to enable [A.K.] to receive educational benefits." Gagliardo, 489 F. 3d at 112; see also R.E., 694 F.3d at 191-92 ("The Department may select the specific school without the advice of the parents so long as it conforms to the program offered in the IEP."). Review of the hearing record supports the SRO's conclusion that Westhampton did not have the 12:1+1 special

---

[15] Of note: The District canvassed several neighboring districts to determine whether they had an appropriate placement for A.K. and facilitated a site visit for the Parents to the Middle Country School District. (See March 2018 CSE at 42, 85, 102.)

class program in the high school at the time of the May 2018 CSE meeting, thereby warranting A.K.'s placement outside of his District in order to provide his IEP, which required A.K. be placed in a life skills program.

Finally, A.K.'s recommended placement satisfies the second prong of the Mainstreaming Test since it includes a special class placement for A.K. within a general education school allowing him to attend electives and lunch with his general education peers. See Newington, 546 F. 3d at 120.  (See also May 2018 IEP.)

In sum, finding the SRO's decision is supported by a preponderance of the evidence and her determination of an appropriate school program is the type of educational policy determination to which the Court affords great deference, see Rowley, 458 U.S. at 206, the Court affirms the SRO's determination that the May 2018 IEP provided A.K. a FAPE in the least restrictive environment, as mandated by the IDEA.

CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Plaintiffs' Motion (ECF No. 39) is **DENIED**.  The Clerk of the Court is directed to enter judgment in Defendants' favor and to close this case.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:  October 11 , 2021
        Central Islip, New York